David A. Koenigsberg
Menz Bonner Komar & Koenigsberg LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
Tel.: (212) 223-2100
dkoenigsberg@mbkklaw.com

Shanin Specter
Kline & Specter, P.C.
1525 Locust Street, Nineteenth Floor
Philadelphia, Pennsylvania 19102
Tel.: (202) 772-1000
Shanin.Specter@klinespecter.com
(Not Admitted in New York)

*Attorneys for Plaintiff-Relator*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br> and THE STATE OF NEW YORK, <br> *ex rel.* HOWARD RUSSO, <br><br> Plaintiffs, <br><br> vs. <br><br> AXCESS, INC., AXCESS GREAT <br> NECK, LLC, AXCESS SPRINGFIELD <br> GARDENS, LLC, BROOKLYN <br> AXCESS, LLC, AXCESS SMITHTOWN, <br> LLC, THOMAS PANETTA, M.D. <br> VASCULAR SURGERY, PLLC, <br> THOMAS PANETTA, M.D., ROBERT <br> DIRAIMO, M.D., DINKER RAI, M.D., <br> and DAVID SCOTT, M.D., <br><br> Defendants. | **FILED UNDER SEAL** <br> **PURSUANT TO 31 U.S.C. § 3730** <br><br> CIVIL ACTION NO. <br><br> COMPLAINT <br><br> JURY TRIAL DEMANDED |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

On behalf of the United States of America pursuant to the United States False Claims

Act, 31 U.S.C. §§ 3729 et seq., and on behalf of the State of New York pursuant to the New

York False Claims Act, N.Y. State Finance Law §§ 187 et seq., Plaintiff-Relator Howard Russo ("Relator") files this *qui tam* Complaint for treble damages and civil money penalties against defendants Axcess, Inc., Axcess Great Neck, LLC, Axcess Springfield Gardens, LLC, Axcess Smithtown, LLC, Brooklyn Axcess, LLC, Thomas Panetta, M.D. Vascular Surgery PLLC, Thomas Panetta, M.D., Robert DiRaimo, M.D., Dinker Rai, M.D., and David Scott, M.D. These claims arise out of the defendants' knowing submission of false and fraudulent claims for payment to the Medicare and Medicaid programs as set forth below. In support of these claims, Relator alleges as follows:

## I. THE PARTIES

1.     Plaintiff-Relator Howard Russo is an individual citizen of the State of New York. Relator was employed by defendant Axcess, Inc. from October 28, 2010 until March 17, 2011 as an office manager. Mr. Russo's responsibilities included personally assisting Thomas Panetta, M.D., and generally managing the Axcess Great Neck office.

2.     Defendant Axcess, Inc. ("Axcess"), is a Delaware corporation headquartered at 600 Northern Boulevard, Suite 115, Great Neck, New York. Axcess is a healthcare management company that develops office-based surgical facilities in collaboration with vascular surgeons and specialty physicians.

3.     Defendant Axcess Springfield Gardens, LLC ("Axcess Springfield Gardens"), is a limited liability company organized under the laws of the State of New York with a business address at 134-35 Springfield Boulevard in Springfield Gardens, New York 11413.

4.     Defendant Axcess Great Neck, LLC ("Axcess Great Neck"), is a limited liability company organized under the laws of the State of New York with its principal place of business at 600 Northern Boulevard, Great Neck, New York 11042.

2

5.     Defendant Axcess Smithtown, LLC ("Axcess Smithtown"), is a limited liability company organized under the laws of the State of New York with a business address at 50 Route 111, Smithtown, New York 11787.

6.     Defendant Brooklyn Axcess, LLC ("Brooklyn Axcess"), is a limited liability company organized under the laws of the State of New York with a business address at 1915 Ocean Avenue, Brooklyn, New York 11230.

7.     At all relevant times, Defendant Axcess was a parent entity, member, and/or subsidiary of, and/or was engaged in the provision of medical care and/or services to Medicare and Medicaid beneficiaries, with and/or for Defendants Axcess Springfield Gardens, Axcess Great Neck, Axcess Smithtown, and Brooklyn Axcess, which were organized for the purpose of rendering and/or supervising the provision of medical care and/or services.

8.     At all relevant times, Defendants Axcess Springfield Gardens, Axcess Great Neck, Axcess Smithtown, and Brooklyn Axcess were parent entities, members, and/or subsidiaries of, and/or were engaged in the provision of medical care and/or services to Medicare and Medicaid beneficiaries, with and/or for Axcess, which was organized for the purpose of rendering and/or supervising the provision of medical care and/or services.

9.     Defendant Thomas Panetta, M.D. Vascular Surgery, PLLC is a professional service limited company organized under the laws of the State of New York with its principal place of business at 600 Northern Boulevard, Suite 115, Great Neck, New York 11042.

10.     Defendant Thomas Panetta, M.D. ("Dr. Panetta"), is a physician duly licensed to practice medicine in the State of New York, with an office located at 600 Northern Boulevard, Suite 115, Great Neck, New York 11042.  At all relevant times, Dr. Panetta practiced as a

3

vascular surgeon in New York, and is a "Provider" under the Medicare and New York Medicaid programs, as defined below.

11.     Defendant Robert DiRaimo, M.D. ("Dr. DiRaimo") is a physician duly licensed to practice medicine in the State of New York, with an office located at 900 Northern Boulevard Suite 140, Great Neck, New York 11021. At all relevant times, Dr. DiRaimo practiced as a vascular surgeon in New York, and is a "Provider" under the Medicare and New York Medicaid programs, as defined below.

12.     Defendant Dinker Rai, M.D. ("Dr. Rai") is a physician duly licensed to practice medicine in the State of New York, with an office located at 370 9th Street Brooklyn, New York 11215. At all relevant times, Dr. Rai practiced as a vascular surgeon in New York, and is a "Provider" under the Medicare and New York Medicaid programs, as defined below.

13.     David Scott, M.D. ("Dr. Scott") is a physician duly licensed to practice medicine in the State of New York, with an office located at 13435 Springfield Boulevard, Springfield Gardens, New York 11413. At all relevant times, Dr. Scott practiced as a nephrologist in New York, and is a "Provider" under the Medicare and New York Medicaid programs, as defined below.

14.     At all relevant times, Drs. Panetta, DiRaimo, and Rai, were agents, servants, and/or employees of Axcess, and were acting within the scope of their agency, master-servant, and/or employment relationship with Axcess while providing "physician services" to beneficiaries under the Medicare and Medicaid programs, as defined below.

15.     At all relevant times, Dr. Panetta was an agent, servant, and/or employee of Thomas Panetta, M.D. Vascular Surgery, PLLC, and was acting within the scope of his agency, master-servant, and/or employment relationship with Thomas Panetta, M.D. Vascular Surgery,

4

PLLC while providing "physician services" to beneficiaries under the Medicare and Medicaid programs, as defined below.

16.     Relator has direct and independent knowledge on which the allegations are based, is an original source of this information to the United States and the State of New York, and has voluntarily provided the information to the United States and to the State of New York before filing this action based on the information.

17.     This suit is not based on prior public disclosures of allegations or transactions in a criminal, civil or administrative hearing, lawsuit, investigation, audit or report, or from the news media. To the extent that there has been any public disclosure unknown to Relator, he is an original source under 31 U.S.C. § 3730(e)(4) and N.Y. State Finance Law § 190(9)(b).

## II.    JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over this case pursuant to 31 U.S.C.

§ 3732(a) and 28 U.S.C. §§ 1331 and 1345. This Court has supplemental jurisdiction over this case for the claims brought on behalf of the State of New York pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, as recovery is sought on behalf of the State of New York arising from the same transactions and occurrences as the claims brought on behalf of the United States.

19.     This Court has personal jurisdiction over the defendants under 31 U.S.C.

§ 3732(a) because the defendants are located in New York and submitted false or fraudulent claims directly or indirectly to the federal and state governments in New York.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.

§ 1391(b) and (c) because the defendants transact business in this District and/or one or more of the acts committed by the defendants and proscribed by 31 U.S.C. § 3729 occurred in this District.

5

## STATUTORY AND REGULATORY BACKGROUND

### A. Medicare

21.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.   Medicare Part A provides hospital insurance for eligible individuals. See 42 U.S.C. §§1395c-1395i.  Medicare Part B is a voluntary subscription program of supplementary medical insurance covering items and services other than hospitalization expenses.  See 42 U.S.C. § 1395k(a)(2)(B).

22.     Medicare prohibits Medicare providers from seeking reimbursement for services rendered to patients who come to their facility through payment of referral fees. See 42 U.S.C. 1320a–7(b)(7).

### B. Medicaid

23.     Medicaid is a federal health insurance system that is administered by the states and is available to low-income individuals and families who meet eligibility requirements determined by federal and state law.    Medicaid pays for items and services, including prescription drugs, pursuant to plans developed by the states and approved by HHS through CMS.   42 U.S.C. §§ 1396a(a)-(b).   States pay health care providers, including physicians, according to established rates, and the federal government then pays a statutorily established share of "the total amount expended … as medical assistance under the State plan."  See 42 U.S.C. §§ 1396b(a)(1).

24.     At all times relevant hereto, the United States has provided funds to New York for its Medicaid program, which New York administers through the New York State Department of Health, and HHS, through CMS, has ensured that New York has complied with minimum federal standards in its administration of the Medicaid program.

6

25.     New York State Medicaid regulations explicitly prohibit Medicaid providers from seeking reimbursement for services rendered to patients who come to their facility through payment of referral fees.

26.     Specifically, 18 N.Y.C.R.R. § 504.6(d) requires that a provider submit Medicaid claims only for services provided in compliance with Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State.   18 N.Y.C.R.R. § 515.2(b) specifically prohibits as an "unacceptable practice":

> (5) Bribes and Kickbacks ...
>
>> (i) soliciting or receiving either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program[; and]
>>
>> * * *
>>
>> (iii) offering or paying either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program.
>>
>> * * *
>>
>> (12) Failure to meet recognized standards. Furnishing medical care, services or supplies that fail to meet professionally recognized standards for health care or which are beyond the scope of the person's professional qualifications or licensure.

Id. at § 515.2(b).

27.     18 N.Y.C.R.R. § 515.2(a) also specifically prohibits as an "unacceptable practice" conduct that is contrary to:

> (3) the official rules and regulations of the Departments of Health, Education and Mental Hygiene, including the latter department's

offices and divisions, relating to standards for medical care and services under the program; or

(4) the regulations of the Federal Department of Health and Human Services promulgated under title XIX of the Federal Social Security Act.

Id.

28.     Title 18 provides further that "no payments will be made to or on behalf of any person for the medical care, services or supplies furnished ... in violation of any condition of participation in the program," 18 N.Y.C.R.R. § 515.5 (a), (b), and that Medicaid payments may be withheld "when [the Department] has reliable information that a provider is involved in fraud or willful misrepresentation involving claims submitted to the program". Id. at § 518.7(a). In other words, in New York State all conditions of participation in the Medicaid program are conditions of payment.

29.     To receive reimbursement from Medicaid in New York State, all providers who participate in electronic billing, as do Defendants, must sign an eMedNY/Medicaid Management Information System Certification Statement for Provider Billing Medicaid (the "Medicaid Electronic Certification") every year.

30.     The Medicaid Electronic Certification reads, in pertinent part:

> I (or the entity) have furnished or caused to be furnished the care, services and supplies itemized and done so in accordance with applicable federal and state laws and regulations;
>
> * * *
>
> In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Health and the Office of the Medicaid Inspector General as set forth in statute or title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including

8

> eMedNY Provider Manuals and other official bulletins of the
> Department....

Medicaid Electronic Certification (Revised Dec. 2010).

## C. The United States False Claims Act

31.     The United States False Claims Act prohibits, *inter alia*, the following:

> knowingly presenting (or causing to be presented) to the federal
> government a false or fraudulent claim for payment or approval;
>
> knowingly making or using (or causing to be made or used) a false
> record or statement material to a false or fraudulent claim; and
>
> knowingly concealing or knowingly and improperly avoiding or
> decreasing an obligation to pay or transmit money to the
> Government.

31 U.S.C. §§ 3729(a)(1)(A), (B) and (G).

## D. The New York False Claims Act

32.     The New York False Claims Act prohibits, *inter alia*, the following:

> knowingly presenting (or causing to be presented) a false or
> fraudulent claim for payment or approval;
>
> knowingly making or using (or causing to be made or used) a false
> record or statement material to a false or fraudulent claim; and
>
> knowingly making or using (or causing to be made or used) a false
> record or statement material to an obligation to pay or transmit
> money or property to the state government.

New York State Finance Law § 189(1)(a), (b), and (g).

## E. The Federal Anti-Kickback Statute

33.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of

congressional concern that payoffs to those who can influence healthcare decisions will result in

goods and services being provided that are medically unnecessary, of poor quality, or harmful to

a vulnerable patient population.  To protect the integrity of the program from these difficult to

9

detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.1 00-93.

34.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute states:

> (b) Illegal remuneration
>
>> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --
>>
>>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, ... shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>>
>> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

> (A) to refer an individual to a person for the
> furnishing or arranging for the furnishing of
> any item or service for which payment may be
> made in whole or in part under a Federal health
> care program, ... shall be guilty of a felony and
> upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more
> than five years, or both.

42 U.S.C. § 1320a-7b(b).

35.     Violation of the statute can also subject the perpetrator to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C.

§ 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

### F.  The New York State Anti-Kickback Statute

36.     The New York State Anti-Kickback Statute provides, in pertinent part, that:

> No medical assistance provider shall:
>
> > (a) solicit, receive, accept or agree to receive or accept any
> > payment or other consideration in any form from
> > another person to the extent such payment or other
> > consideration is given:
> >
> > > (i) for the referral of services for which payment is
> > > made ...; or
> > >
> > > (ii) to purchase, lease or order any good, facility,
> > > service or item for which payment is made ...; or
> >
> > (b) offer, agree to give or give any payment or other
> > consideration in any form to another person to the
> > extent such payment or other consideration is given:
> >
> > > (i) for the referral of services for which payment is
> > > made ... ; or
> > >
> > > (ii) to purchase, lease or order any good,  facility,
> > > service or item for which payment is made ....

11

New York Social Services Law § 366-d.

37. Violation of the New York Anti-Kickback statute can subject the perpetrator to criminal prosecution, fines of between $500 and $10,000, and, if the perpetrator has obtained money or property through the violation, a fine not to exceed double the amount of the gain from the violation. ML § 366-d(c).

## III. DEFENDANTS' FRAUDULENT CONDUCT

### A. False and fraudulent submissions for reimbursement

#### 1. Kickbacks for Referrals

##### a. Dr. Dinker Rai

38. Dr. Rai is chief of surgery at Interfaith and Maimonides Medical Center, and an attending physician at New York Methodist Hospital. Since 2009, Dr. Rai has referred patients to Brooklyn Axcess. For Medicare and/or Medicaid beneficiaries, Dr. Rai performs all surgical procedures with another Axcess vascular surgeon. Axcess then bills the various Medicare or Medicaid insurers under the other Axcess vascular surgeon's name only, leaving Dr. Rai off all billing documentation. Axcess pays Dr. Rai between $1,000 and $1,200 per case based on the number of cases performed.

39. On or about February 17, 2011, Dr. Rai met with Russo and consultant Robin Scott to discuss payments Dr. Rai believed were due to him from Axcess for the prior year. During this meeting Dr. Rai stated words to the effect of "The least Axcess could do is pay me on time as I am taking a big risk in referring so many patients to Axcess."

40. Further, in a letter to Dr. Panetta (and provided to Russo by Dr. Rai) dated November 10, 2010 and entitled "Summarization of the last meeting, Dr. Rai wrote as follows:

12

> Mr. Mark Russell presented a hand typed reimbursement on the patients of first year ended Feb 2010. It covered only 75 % Of [*sic*] the cases. I considered it not valid for discussion as no EMB on super bill was available. Any how [*sic*] in spite of that I agreed to forgo 50% of the promised bonus by Axcess Inc. on the first 100 patients. As it was presented that average collection was 2200$ on each patient and the company will not make acceptable profit if it pays 200$ bonus on each case. He gave a target of at least 2500$ collection to give a bonus of 200$ per case in the future. So we decided to have meeting between the two of us with exact EMB's on each case within 6 months….
>
> We can calculate an average collection on each patient and come to some understanding to find what is the appropriate share between the two parties to be worked out for the future. As per my promise I raised the number of procedures done this year from 100 to more than 200. In the month of October reached the peak of 25 cases per month even missing one week on vacation. At this rate we can hit around 300 cases per year as my contribution. Unless I am appropriately paid there is no point in me bringing all these cases to Axcess Inc.? Let us have a healthy discussion on transparent data to substantiate. I do not want your [company] to lose money on me. At the same time if there is profit then it should be shared appropriately between the two parties after deducting the over head expenses.

41.     Further, in a letter dated March 7, 2011 from Dr. Rai, Dr. Rai wrote "During our last discussion with Mark Russell we agreed that if we can collect more than 2450$ on the average per case then the Axcess can give me the Bonus money per case we are talking about."

42.     Drs. Panetta and Rai thus further conspired to illegally offer and receive, respectively, remuneration in exchange for the referral of Medicare and/or Medicaid beneficiaries to Axcess.

### b. Dr. David Scott and Atlantic Dialysis Management Services

43.     In or about August of 2009, Axcess leased rental space for its Axcess Springfield Gardens location. Axcess shared the rented space with David Scott, M.D. ("Dr. Scott"), a nephrologist. Axcess documents describe the rental arrangement as follows:

13

Total space rented is 4858 sq. feet Axcess will use 22% of rented space or 1068 sq. feet Dr, Scott's practice is using 78% of the space or 3790 sq. feet. The monthly base rent is $13,443.25 per month, Utilities for entire suite have averaged $2,131 per month. Miscellaneous charges as outlined in the lease total $22,803 (for first nine months), a monthly average of $2,533.66. Miscellaneous charges include repairs, rubbish removal, cleaning, elevator maintenance, fire and security system maintenance, building and grounds upkeep, HVAC maintenance and property taxes.

Dr. Scott has fully occupied 3809 sq feet or 80% of the area since 8/1/2009. Axcess paid rent for August, September, October and November of 2009 for a total of $77,396.99. Rental obligations for the total space from December, 09 through April 30, 10 was $81.244.96. From start day of the lease through the end of April 30, 2010 the total rental obligation is $158,642.01; Dr. Scott's obligation for this period is $123,740.76.

Axcess and New York Hospital of Queens have reached a stipulated agreement from May, 2010 through November, 2011 which obligates payment for the current base rent plus utilities and miscellaneous charges of approx. $17,500 per month plus an additional $3,980.39 [18 month amortization of past amount due] for a total of approx. $21,000.00 of which Dr. Scott's obligation will be approx. $16,400.00.

In summary, Dr. Scott's obligation from August, 2009 through April, 2010 is $123,740.76 less $19,000 of payments received for those dates or $104,740.76. Starting in May, 2010 and for each month thereafter his additional obligation will be $16,400.00 per month.

| | |
|---|---|
| Total monthly rents for Great Neck, Smithtown and Brooklyn | $19,539. |
| Total Monthly rent for Springfield Gardens | $21,000 |
| Total Monthly rent----4 centers | 40,539 |
| Dr SCOTT portion of above, if paid | 16,400 |
| Axcess monthly rent if Scott pays | 24,139 |

44.    Soon after Russo began working for Axcess, Paul Toomey, Axcess' former President, informed Russo that Dr. Scott was allowed to be regularly delinquent in paying his rent under the written lease agreement in exchange for his and other physicians associated with Atlantic Dialysis Management Services ("ADMS") providing patient referrals to Axcess.

14

### 2. Billing for procedures for patients not seen by Dr. Panetta

45. On information and belief, at all relevant times Dr. DiRaimo was a non-participating provider in most Medicaid programs, including Health Insurance Plan ("HIP") Medicaid.

46. In or about January 2011, front desk receptionist Diane McDavid informed Russo that she needed to cancel certain patients that were scheduled to be seen by Dr. DiRaimo at Axcess Springfield Gardens because they had HIP Medicaid insurance. Russo agreed with the plan to cancel these visits. However, Robin Scott, a consultant to Axcess, informed Russo and McDavid that a patient should never be canceled over an insurance matter. Instead, Scott instructed McDavid to have the patients seen by Dr. DiRaimo, and bill the visit under both Dr. DiRaimo and Dr. Panetta because Dr. Panetta is a participating provider with most insurance plans at all Axcess locations.

47. Scott informed Russo that, after the patient is seen by Dr. DiRaimo, Dr. Panetta would "co-sign" all of Dr. DiRaimo's notes to make it appear that Dr. Panetta assisted with the patient's surgeries.

48. Many insurance claims were falsely submitted by Axcess to Medicaid and/or Medicare for surgical procedures performed at Axcess locations, as well as in external ambulatory centers and hospitals.

49. Specifically, claims were falsely submitted under Dr. Panetta's name for Dr. DiRaimo's procedures, and/or Dr. Panetta would bill as if he assisted Dr. DiRaimo with Dr. DiRaimo's procedures.

50. Further claims were falsely submitted to Medicaid and/or Medicare. Specifically, claims were falsely submitted under Dr. Panetta's name for procedures performed by another

15

Axcess vascular surgeon, Dr. Rafik Moufid, and/or Dr. Panetta would bill as if he assisted Dr. Moufid with his procedures.

### 3. Falsification of documents prior to Medicaid audit

51.     On or about February 16, 2011, the New York Medicaid Fraud Control Unit ("MFCU") performed an audit of Axcess Great Neck.

52.     The morning of the February 2011 audit, Axcess consultant Robin Scott directed Russo and receptionist Diane McDavid to retrieve missing laboratory and operation notes that had been requested by the auditor.

53.     The morning of the February 2011 audit, Scott directed Russo to bring selected charts, lab reports, and operation reports to Dr. Panetta's office. Upon doing so, Russo overheard Scott tell Dr. Panetta that some of the requested charts were for HIP Medicaid patients seen by Dr. DiRaimo. In the presence of Russo and Scott, Dr. Panetta signed his signature on every document that was signed by Dr. DiRaimo in the records of those patients identified as HIP Medicaid beneficiaries.

54.     Also on the morning of the February 2011 audit, Russo observed surgical technician Rosemary Sanfilippo write Dr. Panetta's initials in some of the charts requested for the audit.

55.     Further, on or about the business day prior to the February 16, 2011 audit, Russo observed Sanfilippo forge Dr. Panetta's initials on a lab report in a patient medical record.

56.     Prior to the February 16, 2011 audit, Physician Assistant Heather Hurd further told Russo that she routinely initialed documents and billing slips, as well as checked off billing codes, as if she were Dr. Panetta.

16

#### 4. Failure to return overpayments to Medicare and/or Medicaid

57. In or about January 2011, Dr. Panetta discovered that billing clerk Michael Harris had written checks from Dr. Panetta's personal checking account and had deposited the checks into his (Harris's) personal bank account.

58. Specifically, Harris would annotate a Medicaid or Medicare overpayment refund in Dr. Panetta's check book receipt section for the overpayment amount requested. However, instead of making the check payable to the appropriate Medicare and/or Medicaid insurance carrier, Harris made the check out in his own name and deposited the funds in his personal savings account.

59. On information and belief, Axcess failed to refund or report some or all overpayments made to them from Medicare and/or Medicaid.

#### COUNT I

#### (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(A))

60. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

61. Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims for payments from Medicare and Medicaid – in violation of 31 U.S.C. § 3729(a)(1)(A).

62. Said false and fraudulent claims were presented with defendant's actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

17

63. The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of said Medicare and Medicaid claims by defendants.

64. As a direct and proximate result of the false and fraudulent claims made by defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

## COUNT II

## (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(B))

65. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

66. Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

67. Defendants' knowingly false records or false statements were material, and upon information and belief continue to be material, to the false and fraudulent claims for payments they made and continue to make to the United States for Medicare and Medicaid reimbursements and benefits.

68. Defendants' materially false records or false statements are set forth above and include, but are not limited to, fictitious physician signatures and false certifications and representations made or caused to be made by defendants that the services they provided were in

18

compliance with all laws and regulations regarding the conditions of participation in and payment by the Medicare and Medicaid programs.

69. These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

70. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

## COUNT III

## (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(C))

71. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

72. Defendants conspired to defraud the United States by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States.

73. The United States has sustained damages as a result of the conspiracy described above in an amount to be determined at trial.

74. As a direct and proximate result of the above conduct by defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation of the False Claims Act.

19

## COUNT IV

## (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(G))

75.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

76.     Defendants knowingly made, used or caused to be made or used, and continue to knowingly make, use or cause to be made or used, false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

77.     As a direct and proximate result of the above conduct by defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation of the False Claims Act.

## COUNT V

## (VIOLATION OF THE NEW YORK FALSE CLAIMS ACT – N.Y. State Finance Law § 189(1)(a))

78.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

79.     Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the State

20

of New York – i.e., the foregoing false and fraudulent claims for payments from Medicaid – in violation of N.Y. Finance Law § 189(1)(a).

80.     Said false and fraudulent claims were presented with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

81.     The State of New York relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said Medicaid claims by defendants.

82.     By virtue of the false or fraudulent claims, the State of New York suffered damages and therefore is entitled to recover from defendants treble damages under the NYFCA, in an amount to be proved at trial, plus a civil penalty of at least $6,000 for each violation.

## COUNT VI

## (VIOLATION OF THE NEW YORK FALSE CLAIMS ACT –
## N.Y. State Finance Law § 189(1)(b))

83.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

84.     Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the State of New York, in violation of N.Y. Finance Law § 189(1)(b).

85.     Defendants' knowingly false records or false statements were material, and upon information and belief continue to be material, to the false and fraudulent claims for payments

21

they made and continue to make to the State of New York for Medicaid reimbursements and benefits.

86.     Defendants' materially false records or false statements are set forth above and include, but are not limited to, fictitious physician signatures and false certifications and representations made or caused to be made by defendants that that the services they provided were in compliance with Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State.

87.     These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

88.     As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendants, the State of New York suffered damages and therefore is entitled to recover from defendants treble damages under the NYFCA, in an amount to be proved at trial, plus a civil penalty of at least $6,000 for each violation.

## COUNT VII

### (VIOLATION OF NEW YORK FALSE CLAIMS ACT –
### N.Y. State Finance Law § 189(1)(c))

89.     Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

90.     Defendants conspired to defraud the State of New York by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the State of New York.

91.    As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendants, the State of New York suffered damages and therefore is entitled to recover from defendants treble damages under the NYFCA, in an amount to be proved at trial, plus a civil penalty of at least $6,000 for each violation.

## COUNT VIII

### (VIOLATION OF NEW YORK FALSE CLAIMS ACT – N.Y. State Finance Law § 189(1)(g))

92.    Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

93.    Defendants knowingly made or used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of New York, in violation of N.Y. Finance Law § 189(1)(g).

94.    As a direct and proximate result of the above conduct by defendants, the State of New York suffered damages and therefore is entitled to recover from defendants treble damages under the NYFCA, in an amount to be proved at trial, plus a civil penalty of at least $6,000 for each violation.

## CLAIM FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against defendants for treble the amount of the United States' and the State of New York's respective damages to be determined at trial, and all allowable civil penalties, attorney's fees, interest and costs under the False Claims Act, the NYFCA, and for all other and further relief as the Court may deem just and equitable.

Dated: New York, New York
       June 25, 2012

Respectfully submitted,

**MENZ BONNER KOMAR & KOENIGSBERG LLP**

BY: _____

David A. Koenigsberg
444 Madison Avenue, 39th Floor
New York, New York 10022
(212) 223-2100
dkoenigsberg@mbkklaw.com

**KLINE & SPECTER**
*A Professional Corporation*
BY:   SHANIN SPECTER, ESQUIRE*
DAVID J. CAPUTO, ESQUIRE*
DAVID C. WILLIAMS, ESQUIRE*
1525 Locust Street, Nineteenth Floor
Philadelphia, Pennsylvania 19102
(215) 772-1000
Shanin.Specter@klinespecter.com
David.Caputo@klinespecter.com
David.Williams@klinespecter.com
* Not Admitted in New York

**JOSEPH TRAUTWEIN & ASSOCIATES, LLC**
BY:   JOSEPH TRAUTWEIN, ESQUIRE*
17 Auchy Road
Erdenheim, Pennsylvania 19038
(215) 764-2301
jtrautwein@cpmiteam.com
* Not Admitted in New York

*Attorneys for the Plaintiff-Relator*